May it please the court, Ryan Farrell on behalf of appellant Robert Matus. I'd like to say good morning and happy Valentine's Day. Give you a quick intro to this case. My client Mr. Matus, a California consumer, purchased defendant's product Vidox in California in San Bernardino County. He in San Bernardino County relied on their website advertising. In San Bernardino County he consumed the Vidox and in San Bernardino County he did not receive the benefits or was injured by the Vidox product. You've got that Mavericks case, a Ninth Circuit case, that basically says only a website is not enough. It's not an interactive website. There was no evidence that it was and it says you need, quote, something more. So what something more do you present for jurisdiction? Your Honor, I'll get to that right away. In fact, because first, before we get to that... Could you speak into the mic, please? Sure. I'll get that right away, but first what we have is we have no dispute regarding the intentional lack. That was done under the district... I think you should answer the question. No, I'm going to. The issue then... Now, not later. Okay, I'll answer now. The issue then of the website is where the judge found that there was the arise out of issue and the judge said that without more information regarding the website or specifically being related to that website at California, then... This seems to be the problem here. There was a website, they did sell things, but they didn't sell it to him. That's correct, Your Honor. So as far as he's concerned, the only thing he's relying on is having seen some information on a website. He's relying on the efficacy claims... I'm sorry? He's relying on the efficacy claims made regarding the product... So it's just reading a website. So whether it was interactive, whether it sold stuff, is irrelevant as to him. For the most part, yeah. Here's the real issue on this. This, unfortunately, as a plaintiff's class action attorney, I'm not thrilled by the Bristol-Myers-Squibb case and that case being 137 S.C.T. 1773 that just recently came out discussing jurisdiction specific jurisdiction. And that's what we're here before. That's what we're here about. However, that is the seminal case now regarding specific jurisdiction. And if we go to that case and acknowledge that in the underlying... In the Squibb case, they're talking about Plavix, a pill that was not sold by the defendant. It was sold by resellers. It was advertised by the defendant. There was a national campaign similar to here where defendant admits in its own briefing that is attached, and I can give the citation, that they are... That they advertise to the world. That they're a worldwide company advertising the world well known to the world. Okay. What the Bristol-Myers-Squibb case says, and I'm going to read a number of quotes and feel free to jump in at any point, but at 1778, it says, BMS did not develop Plavix... BMS being Squibb, did not develop Plavix in California, did not create a marketing strategy for Plavix in California, and did not manufacture, label, package, or work on the regulatory approval of the product in California. BMS instead engaged in all of these activities in either New York or New Jersey, but BMS does sell Plavix in California. Between 2006 and 2012, it sold almost 187 million Plavix pills in the state and took in more than 900 million from those sales. Citation admitted. The amounts... But they didn't sell these... In this case, whatever they are, the additives or whatever they are, were not sold by them to anybody in California. Correct. We're talking about the BMS case. Does Bristol-Myers alter our analysis in Mavericks? Anything that disagrees with Bristol-Myers at this point does. Bristol-Myers supersedes that. Okay, well, I'm asking you a question. Is Mavericks, now inconsistent with Bristol-Myers? I don't have an answer to that, Your Honor. I don't know. Okay, then let's assume that Mavericks is still good law. You still haven't answered Judge Woodcock's question. What's the something more? Well, let's go back to what the something more is that it's advertised to everyone. Under that rubric that the judge in the underlying case did, there would be no state that would have specific jurisdiction in this case. No, that's not true. You can sue them in Georgia. No, but that would be general jurisdiction. But that's the point. This would, the argument there, or the argument we're talking about, would vitiate specific jurisdiction. And so what? But that's not what Bristol-Myers Squibb... What does Bristol-Myers Squibb say? Everybody's entitled to have one state where they get specific jurisdiction? No, what Bristol-Myers Squibb says regarding specific jurisdiction on page 1780 of Bristol-Myers Squibb is, specific jurisdiction is very different. In order for a state court to exercise specific jurisdiction, the suit must arise out of or relate... I know what specific jurisdiction is. I don't think there's anything in Bristol-Myers that's breaking new law on this. So what, but what, what, what difference does that make? Your client could have sued them in Georgia. Yes, you would, you would have a good argument for general jurisdiction. But it would also be an argument for specific jurisdiction. That's where they manufactured the product that injured him. The injury, though, for specific jurisdiction, as where the injury took place. But the injury here is not actually the product, is it? It's the advertising. It's the advertising. But the advert, the advertising... Took place in Georgia. No, the advertiser traded in Georgia. The advertising, similar to Plavix, was viewed in California. Okay, your rule then would be any place you view the advertising, you have specific jurisdiction. Is that the rule you want us to adopt? The rule that I would have you adopt is the rule from Bristol-Myers Squibb, which is any place where a plaintiff suffers injury from a product such as this is where specific jurisdiction lies. Any place where there is injury? Any place where the resident plaintiff suffers injury from the product is where... But this isn't the product. This is, again, the injury here isn't from the product. I would say the injury is from the product. The injury is from purchasing the product in California, viewing the website. The purchase had nothing to do with, as I understand it. I mean, it only had to do with your, the defendant insofar as they put it into commerce and sold it to somebody else. As far as we know, not in California. But they admit that they put it into commerce and that they sell in California. It's irrelevant. They sell in California, but they didn't sell to him in California. But that's irrelevant. Plavix did not sell, Bristol-Myers Squibb did not sell directly to any of the in-state presidents in the Bristol-Myers Squibb case. And they didn't have jurisdiction. No, the non-residents did not have jurisdiction. The residents absolutely had jurisdiction, and in fact, Bristol-Myers Squibb stands for the fact that those non-residents... But Plavix, we don't, it didn't come up because it wasn't really what the case was about, but Plavix could have sold to retailers, presumably did, in California, who then told to the individual. But here, the distributor, the manufacturer didn't, or this is no allegation, that the person, that they sold to anybody in California, including a defendant, itself sells to California. Right, but they didn't sell, but the product that got to the, your client, there's no California connection. Well, no California connection is the injury. The injury occurred in California, similar to Plavix. Counsel, the rule you've just adopted would undo an awful lot of cases, including Supreme Court cases. It would just undo all of our, if all we have to do is look at the place of injury, that is, that is going to be a reversal of, you know, a hundred years worth of jurisdictional cases. Basically, every single jurisdiction in the state, in the entire United States, has jurisdiction over this claim. Any, no, only where a resident... A resident is injured. Exactly, same with Plavix. So every single place that a resident is injured, has jurisdiction. For that, for that resident, absolutely. That's an extraordinary extension of the doctrine, as I understand it. That's exactly what Plavix says, is that... I'm sorry, could you tell us where that is? That's what Bristol-Myers says? I'm sorry, you're right. Where? I'm sorry. Where? Tell us where. Okay, let's go right into, let me find it for you. So it talks about the third party in Bristol-Myers, or in the Squid case. Okay, on 1781, and I'll read the entire paragraph. The State Supreme, it starts, the present case illustrates the danger of the California approach. The State Supreme Court found that specific jurisdiction was present without identifying any adequate link between the State and the non-residents' claims. As noted, the non-residents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California. The mere fact the other plaintiffs, the California plaintiffs, were prescribed, obtained, and ingested Plavix in California, and allegedly sustained the same injuries as did the non-residents, does not allow the State to assert specific jurisdiction over the non-residents' claims. As we have explained, a defendant's relationship with a third party, that would be... First of all, this is only saying what isn't so, not what is so, but if you assume that it means that the plaintiffs, the resident people could sue, in this case, in Bristol-Myers, the injury was the ingestion, right? There was something wrong, this was going to hurt you. Eating it was going to hurt you, right? So if they ate it in California and put it in their mouth, it hurt them, was the allegation. That's not your allegation. This product itself isn't hurting you. It just isn't doing what you read on the website. However, in the Bristol-Myers Squibb case, the advertising was that it would not hurt you, that it would do this same thing. So we're in the same place, in that it's the advertising that did not turn out to be correct in the Bristol-Myers Squibb case. This would not hurt you. Was that a false advertising case? Was the underlying? Yeah. I don't know, Your Honor. I'm sorry. However, I do want to go on on that because it says, and this is the third party, this is the California residents. As we've explained, a defendant's relationship with a third party, the California residents, alone is insufficient basis for jurisdiction. This remains true even when third parties, the California plaintiffs, here the plaintiffs who reside in similar to those brought by non-residents. We read it. I understand why. It doesn't say affirmatively that these other people could bring the case, but even if they could, they're assuming they could, but they're not really deciding they could. But nonetheless, as I say, the assumption here is that these pills, when you take them in California, are injuring you. The pills are injuring you. That's not your claim. The loss of money is the injury, which was spent in California. But that wasn't to the defendant. It wasn't the defendant. I mean, indirectly he got the money, but he didn't sell it in California. He had nothing to do with it being sold in California to your client, right? That's correct. Let's take the hypothetical then. A company like Iovade, a Canadian company that sells hydroxycut, they sell it through Walmart. Under this rubric that we're talking about right now, they could only be... Because if the defendant had sold it to Walmart in California and Walmart in California had sold it to your client, we'd have a different situation. But in this instance, there's no indication that the defendant sold it to anybody in California. No, the defendant admits that it has... Well, they sell it to different people, but not in the line that got to your client. Yes, they admit they sell it to nine resellers and that one of those resellers sold it to my client. Right, but not because they sold it to Walmart. And so if we were to take that cut... Because they're not selling it to Walmart for California, just Walmart in general. That may be and it may not be enough. And that's the case. If we're going that route, that a company like Iovade, a Canadian company, could never be held liable in a California court. Well, it could be held liable if the product was, perhaps, was dangerous and hurting somebody, but that's not the claim here. I don't think there's a distinction there, Your Honor. Simply because the product is dangerous or not doesn't change the fact that the injury, in fact, is the loss of money. And the injury, in fact, occurred in California. I don't think the injury, in fact, is loss of money if you take something and it injures you. That's not the injury. The injury is the injury. But I don't think... I think it's a distinction without real meaning there in the fact that it's still... And the injury occurred in California. Whether it's a physical injury or a loss of money, the injury, which determines specific jurisdiction, occurred in California. All right. Do you want to reserve time? I do, please, Your Honor. Thank you. Your Honors, may it please the Court. My name is Jeffrey Peel. I'm the attorney for Premium Nutraceuticals, the EPILE in this case. This... As I said in my brief, Robert Mattus is a unicorn, and I think that that has a specific bearing on this case. One thing that a company that interacts in interstate commerce needs to be able to do is to have commercially reliable standards upon which to act. In this particular case, the fact record shows out that Premium Nutraceuticals goes out of its way to not be hailed into court into California. Well, wait. Do you sell through your website to California? Yes, my client, Premium Nutraceuticals, sells through their website. And if somebody buys it through their website in California, I think in your brief you, at least at some point, assume that there would be jurisdiction as to the person who actually bought it in California through the website. I think absolutely there would be jurisdiction. Certainly have a contract action that you brought in California. Yes, you'd have some sort of contract action in that case. However, if you look at what Premium Nutraceuticals actually does is they have a very strict arbitration clause and class action waiver. So while they do market in California, and they have a 100% money back guarantee. So they say to all of their clients, yes, we want to avail ourselves of the California market. But if you purchase from us, before you purchase it, you have to agree to arbitrate any dispute. And if you have a problem, we'll give you all your money back. And the record in this case actually bears out that Premium Nutraceuticals honors that. On page 178 of the record, you're going to find the declaration of Joseph Testino, the company's CEO, where he says that he's issued, just in the year alone, $624,323 in refunds to customers throughout the country who have basically made the claims plaintiff had. That, well, you know, this product doesn't do what they say it's supposed to do. So in this particular case, if you look to the Walden, and I might say the name wrong, Walden versus Fiori case, the court is very clear that due process requires that a defendant be hailed into court in a forum state based on his own affiliation with that state, not based on the random, fortuitous, or attenuated context he makes by interacting with other persons affiliated with the state. In this particular case, Premium, as I mentioned previously, has decided that in its interaction with California, it wants to be very limited. You know, with all due respect to the, you know, honorable courts of the state of California, they don't want to be here. They want to market their products, but they want to do so in a way that limits their ability to be hailed into court, and they do it legally pursuant to the Federal Arbitration Act and other things. What's your take on Bristol-Myers? My take on the Bristol-Myers, I'd actually highlighted a quote from it. Bristol-Myers says explicitly, even regularly occurring sales of a product in a state do not justify the exercise of jurisdiction over a claim unrelated to those sales. Now, in the district court, I was on the verge of, I did not, but I was on the verge of basically conceding purposeful direction, and luckily Judge Pregerson stopped me, and he said, well, don't do that. He kind of insinuated that he's willing to do it, because I really hung my hat on the concept of arises out of. Under the analysis, you have to show purposeful direction, and that the claim arises out of, and my argument in this case was always one of causation. We did not sell to Robert Mattus. Premium Nutraceuticals marketed to one of its independent resellers, and when I used the phrase earlier, not the phrase, the word, the unicorn specifically, if you look at the statistics, Premium Nutraceuticals nationwide sales only 1.4 percent. I don't know why that one very well. I mean, if the, if this was this hypothetical person we talked about before, who actually purchased through your website, what difference would it make if he was the only one in California? If, if, I don't think it would matter. Right, so I don't understand what difference these numbers make. Well, part of the analysis requires applying the Asahi fairness factors, you know, if I'm remembering back to civil procedure appropriately. You have this concept of, is a litigant on notice? Can they reasonably be anticipated that they're going to be hailed into court in that foreign jurisdiction? And I brought up the statistics, not because I thought it was, you know, definitive, but I think when, if we get to that portion of the analysis, which I don't think we do, but if we get there, we see that you have a company that says 1.4 percent of its total sales are in California. And of those 1.4 percent, only 1.9 percent are attributable to the resellers. So you're talking, and this is not a fact that's not in the record, this particular statistic, but you're talking about 75 to 100 people that might fit into this category. I really, for specific jurisdiction purposes, I don't understand why it matters. For, for, it's, it's purely the fairness factor. I mean, at the end of the day, the fairness factor, the third element. Why would that make a difference in specific jurisdiction? Well, in specific jurisdiction, the third element is that, you know, elements of fair play and substantial justice. If you had the minimum contacts, if you had otherwise satisfied the purposely availed and minimum contacts, then what would be unfair about hailing them into California? I think in this particular case, what would be unfair is that there would be no reasonable expectation that they would be coming into California because their other sales are bound by this arbitration clause and are bound by this class action waiver. So just because there might be this, this errant sidestream where there's... But if this errant sidestream person can trace, had somehow managed to, to buy it from, I mean, supposedly they managed to bought one where they forgot to put the arbitration clause in, and he's the only person in the, in California. There's, there's, if they had bought it from them, you still have the same problem. Maybe he's the only one. I think we should get off this. It doesn't make sense to me. Yes, you're right. And I think that's right. I mean, as, as Your Honor's pointed out, Judge Woodcock, you know, brought up this question of something more. And I think that was, that was something that the district court really hung its hat on in this particular case, that there is not that something more. We have two different fact patterns. We have the people who are purchasing it through resellers, and then this website that's supposedly creating jurisdiction. Is the website interactive at all? The website that Premium has, yes, I would say it's interactive. Yes. It is interactive? Meaning it's, it actually sells things. Yeah. You can go to, today, vidox.com. And you'd be buying directly from, from your Premium Nutraceuticals? Yes. I mean, you'd be a customer directly at that point. So it's interactive in that sense that you can, that you can buy, you can buy stuff. Okay. Is it, is it interactive in the, are you going to end up with, with pop-ups on the side? That I don't know. I know that there is a, and I don't know how much of this is in the record, but I do know that when you purchase, that when you click, the screen pops up and says, bear in mind, if you've made a purchase, you're binding yourself to these terms. So if you, if you had a, does, does, does the webmaster have any way of identifying what region of the country or what state you're from when, when you, when you, when you go to the website? When you just look at it. I think, I don't want to speak out of turn. I know that that fact is not in the record, but I believe that there probably is some, some way that they can. I know that in this particular case, what is in the record is in the declaration of Joseph Testino, he states that he has this Limelight's customer relationship management software, where he can identify every person who's ever entered information on his website. Okay, but that would, so that would, but there you, you actually have to enter some information. So it takes some, it takes some action on behalf of, on behalf of the viewer. That's correct. Not strictly pass it. So, what I'm trying to get at is, is if you go to this website, and the webmaster can identify that you're from California, are you going to get any, any, any special testimonials, or something tailored to customers in California? I believe the answer to that question would be no. Part of, part of Premium's model on their website, and on their terms of condition page, they really wanted to limit their litigation to Georgia, to the best of their ability. Well, but that's a different problem. But, but, for example, with many websites, if you go on them just to look at something, they'll start sending you emails, saying, oh, I got one recently, I wrote a nasty note back. I see you looked at this. Why are you interested? Is there anything like that going on here? Only if the customer requests it. So if the customer were to go on, or the viewer, and say, you know, I am interested in this product, send me more information, they can enter their information. Do that. So in other words, it's interactive, not only in the sense you can buy things, but that you can ask, can you ask questions on it? I don't know if you can ask questions. I know some websites now, they have these bots where they kind of, they're like fake people that will talk to you, you know, in a chat window. I don't believe Premium does that. They're actually real people, I hope. But anyway, go ahead. They do a good job, you know, assimilating real people. But I don't believe the website has that, in this particular case. What was the something more in brand, in Mavericks? In Mavericks? I think the something more, in that particular case, was the nature of the tort itself. And actually, I'm answering your question, so don't think I'm changing gears here. This came up in, I forget which, I believe it was Bristol Myers versus Squibb. They actually talk about how the nature of the tort itself was really unique in this particular case. And when they go through Calder and all these other things, they talk about libel. And they say one of the elements of libel is the dissemination of something that's false. And so the tort occurs when the person reads it. When you open up the paper and you read the libelous statement about something, that's where the tort has occurred. And I said, you know, a lot of this case law is relatively unique because we have this really weird tort that we're focusing on where the injury is kind of disassociated from the actual dissemination, or from the actual defendant. And so the something more, I believe, in Mavericks was something along those lines. They said, what we have here is someone put together some copyrighted photographs, and they were trying to market these photographs. And then here comes this company, and they put our copyrighted photographs out there, and all of a sudden we've lost value. So their diminished value kind of comes along with the dissemination. I don't believe that occurred in this case. I mean, and the distinction is on reading versus relying. That quote, I'm sorry, it was in Walden versus Fiori. And the exact quote is, the strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to and read and understood by third persons. So in this particular case, I don't believe that, you know, we're going down that path where we have this bizarre tort. What we have is Mr. Matthews saying he was injured by premium, but premium wasn't involved in that injury in any way, shape, or form. I mean, setting aside the fact... Well, wait a minute. Premium was involved because premium made the representations, including on its website. Premium made representations about the efficacy of its product on its website. I mean... What do you mean it wasn't involved? It was involved. Maybe it's my own personal bias. I'm just skeptical of the claim that someone goes on this website, does all this research, and then finds some third party vendor to purchase it from. If you're on the website, buy it there. Well, that's not true in general. I mean, these days, you will routinely go and look, see if you can get a better price somewhere else, but you start with the manufacturer. And I think it would have been nice to have these facts. At the end of the day, it is the plaintiff's burden to establish jurisdiction, and we kind of wanted that. I know at one point in the reply brief, the appellant accuses the appellee, me, of being relatively cagey with some facts, but I think at the end of the day, we were really kind of frustrated by the fact... I think what you're saying, because in Brand, I mean, they didn't really... I guess they sold some California-specific advertising. Mavericks, I mean. But mainly, and I guess you said this, it was a defamation action, is that what it was? I think that one was... I think Brand... I think it would have been kind of a trademark action in that case. Like a trademark or a patent. A trademark in this particular case. They had copyrighted... Copyright. It was copyright. They copyrighted these photographs, and someone was stealing their copyright. And that actually gets to a lot of... I mean, a lot of the case law that the appellant cited revolves around these copyright actions and trademark actions and things like that. I pointed this out in my brief. When I disseminate a product that violates some sort of copyright or trademark, that tort occurs as soon as the person sees that. That's not the nature of California's false and misleading advertising torts. Well, is that true? Doesn't a tort occur when you copy it? The tort occurs, I believe, when the person's a liar. That is... You may count up how many people saw it, but the tort is the copying. I think the tort under the false advertising law in California requires that the person actually purchase the product and establish that it did not behave in the manner that it was claimed to behave. So, the risk of... Maybe I won't go down that road. I mean, this is a male enhancement pill, and so Mr. Mattis's claim is basically something akin to it. He was not enhanced in any way. And so, the tort occurs once the product does not do what he says it does at that point. I guess I see that I'm getting short on time, so what I would say, the main thrust of what the appellees were trying to establish here is the arises out of prong. And this has firm precedent in the Burger King case and several other cases from the Supreme Court and recently. The fact is, Premium Nutraceuticals did not market this product to Mr. Mattis, and so the jurisdiction that is specific to this transaction, the factors that are relevant to this transaction in jurisdictional analysis simply do not apply. The other thing I'll point out simply, because I'm getting short on time, it is Valentine's Day, and my wife, Hillary Lenspeil, who's an attorney, helped me draft my brief. She's infinitely smarter than me, so I want it to be public record that I wished her a happy Valentine's Day. I believe I'll conclude with that, Your Honors. Thank you very much. Yes, sir. Excuse me, Your Honor. There are just three brief things that I'd like to address. First, defendant, or sorry, appellee who just made the claim that they don't market their product to California. However, in their own briefing on page 214 of the record, paragraph 18, line 18 through 22, it says, Plaintiff, and that would be appellee, has exhausted countless resources spreading its brand across the U.S. and the world. Vidox is endorsed by PGA Tour professionals Mark Kalkovechia and Brian Gay. Vidox is also the primary sponsor of NASCAR number 66. In addition to the resources spent securing these endorsements for the brand, Premium Nutraceuticals also exhausts significant resources marketing Vidox online and on television. So yes, it was marketed to every state and to the entire world. Now, going back to what we discussed, I'd like to just point out a few cases. In the Starlight International case for Lifeguard Health LLC, and this is in Northern District, California, July 22nd, 2008, 2008, U.S. District, Lexus 58927, it states, When a merchant seeks the benefit of engaging in unlimited interstate commerce over the Internet, it runs the risk of being subject to the process of the courts of those states. The second case I'd like to cite is the Bridgestone case, and it says, the Bridgestone, this is 99 Cal App, 4th at 777. It states, The second appellate court concluded that a manufacturer's placement of goods in the stream of commerce with the expectation that they will be purchased or used by consumers in California indicates an intention to serve the California market directly or indirectly and constitutes purposeful availment of the income earned by the manufacturer from sale or use of its products in California is substantial. The fact of the matter, Your Honors, is this was marketed towards California, as it was marketed towards every state. The only way to find that there is not specific jurisdiction here in California is to find that the only place there would be jurisdiction is in Georgia, and with that, that is not the law of Bristol-Myers-Squibb that was just recently put out by the Supreme Court. Thank you very much. Thank you very much, Your Honors. I appreciate your time. Have a wonderful day. The case of Mattis v. Premium Nutraceuticals is submitted. We'll go to Reconyick v. Deltra Family Care.
judges: Berzon, Bybee, Woodcock